24-cv-903-jdp

1. This is a civil rights action filed by Austin Koeckeritz, then a state prisoner, seeking declaratory, class action and money damages and relief under 42 USC. 1983, alleging largely medical, body and access claims in violation of the First, Fourth, Fifth, Eighth Amendment; as well as the ADA/RA and the RLUIPA. The plaintiff also alleges state tort claims; to be readded under supplemental jurisdiction.

### Prayer For Relief

2. The plaintiff seeks a declaration that the acts and omissions described herein violated the plaintiffs' rights under the constitution and laws of the United States.

2.1 An injunction under class action, largely with reliefs akin to those in (Jensen v. Thornell, No: CV-12-00601-PHX-ROS, Arizona 2023)

2.2. A jury trial on all issues triable by jury

2.3 Compensatory damages exceeding $75,000, for outlined injuries sustained; with seperate claims per injury

2.4 If compensatory damages cannot later be adequately determined, presumed damages are sought

2.5 Punitive damages are sought with violation damages for each instance; nominal as a last resort.

2.6 Damages are sought jointly and severally against each named defendant

2.7 Any additional relief the court finds just, proper and equitable.

3. Except as to matters alleged on information and belief, the plaintiff/I verify the entirety of this complaint pursuant to 28 USC. 1746, and declare it true and correct.

Austin Koss        11/29/24   Ashland FCI, Po 6001, Ashland KY 41105

The defendants for Pierce County 555 W overlook
Dr, Ellsworth WI 54011 are:

1. Pierce County
2. The Sheriff
3. The medical director
4. The Medical Health Administrator
5. Lt. Ali verges
6. Provider M, Douglas
7. Nurse Jane Doe
8. Mental Health Jane Doe
9. The dietician
9.5 SGT Josie Austin

The defendants for Saint Croix County 1101 Carmichael
R d, Hudson, WI 54016 are:

10. Saint Croix County
11. The sheriff
12. The Medical director
13. The Medical Health Administrator
14. The Jane or John Doe doctors involved
15. Nurse Ginnie
16. The Mental health Jane Doe
17. Officer Bradick
18. The dietician

19. All the defendants had acted under the color
of state law at all times relevant to this complaint

1. The plaintiff was booked into the Pierce County Jail in Wisconsin on August 5th 2022, ID # 354699

2. During booking, the plaintiff notified Jane and John Doe jailers of the plaintiffs' medical needs; including recent and active prescriptions, spinal condition needs, chronic insomnia and other elsewhere outlined conditions.

3. The plaintiff was directed to later speak to medical, as the facility did not have night or weekend medical staff.

4. The plaintiff was placed into a segregation cell, not at the plaintiffs' request, around 130 AM on 08/06/22.

5. The plaintiff was locked down 23 hours per day

6. No programs, rec or relevant religious services were available to the plaintiff.

7. The cell the plaintiff was in had 24 hour lighting, as would later blocks, and exastrobated the inaccess to sleep; as did slamming doors, and the loud beep of the guards' "wand" used during rounds.

8. To note, the beep issue could have been remedied by disabling the chime function.

9. On 08/09 at 453 PM, the plaintiff sent an electronic request to medical seeking pain relievers, chapstick, and insomnia treatment

10. Onward, an electronic request will be "ELR".

11. Around 08/10 the plaintiff saw provider "Douglas, M." at an outside clinic; the jail nurse's exclusive go-to.

12. The provider verified active prescriptions, need for insomnia and other interventions, in part.

13. Transport deputy Knutson (or variation of spelling) stated the Dr need not order mattress accomodations as the jail could provide such.

14. The deputy stood in during the entire appointment.

15. Upon return to the jail, Knutson stated that the jail does not allow anyone double or specialty mattresses.

16. On 08/10 10:15AM an ELR to medicalwas sent requesting migraine and spine interventions, Insomnia treatment, extreme dry skin intervention (past reported in person) and Chapstick. A similar request was sent on 08/11 7:48AM

17. The response was received on 08/11 at 230AM stating that medical records could not be verified; and that medical did not provide lotion or chapstick.

18. The nurse asked electronically if past approved asprin, Naproxen and caffeine (for migraines) medications were on their way on 08/12; the plaintiff responded that such had already been dropped off; and that the plaintiff "would like sleep meds tonight."

19. On 08/17 at 2:22 PM the nurse sent that ordering Clonidine (sleep aid) would cost the plaintiff around $15; the plaintiff agreed to pay such via ELR at 2:41PM

20. On 08/17 the plaintiff was moved from segregation to medium security general.

21. The cell was in block G; and the move from segregation took place prior to an attorney meeting the same day.

22. On 08/19 Melatonin was approved; a nurse message conveyed that the provider had not included Clonidine on his orders to her. The pain relief became available this day.

23. On 08/23 an ELR follow up to receive pain meds and Clonidine, a second mattress and for fruit or more nutritional meals was sent

24. on 08/24 the nurse ELR responded that the jail does not provide second mattresses, that the provider still had not sent an order for clonidine, and that the menu was approved by a dietician

25. on 08/24 inmates threatened the life of the plaintiff and had been upon, before this date, a campaign of harrassment including watching them use the bathroom, preventing use of the TV, shooting their name at all or any hours non-stop until the plaintiff responded, to which some derogatory remark would be made, and the cycle repeated. staff were notified. staff handled the matter by speaking to the persons and asking them to essentially play nice. The plaintiff was then on claimed a "rat" and abused for the remainder of the plaintiffs' time in G block, including other inmates conspiring to kill the plaintiff and claim it was a lesser offense assisted suicide. The handling percievably put the plaintiff in ongoing fear for their life, and at great risk of harm.

26. on 08/25 or 08/26 the plaintiff received clonidine and pain relief.

27. The plaintiff was subjected to 3 weeks nearly of immense pain, and without adequate to any daily sleep.

28. on 09/08 around 6:30 AM, a detailed request for the addression of medical needs, various accomodation needs and ongoing harm was written out and given to a staff member on rounds, to give to the nurse.

29. Later that day, the nurse told the plaintiff that she'd thrown the note away after skiming it.

30. On 09/08/24 at 3:49P.M the nurse sent an ELR stating that mouthwash, specialty shampoo, pain relief and other medical items were approved to have mailed in.

31. The nurse on 09/08 again denied a second mattress or to treat painful and open bedsores.

32. SGT Bryce approved, then denied incoming books, conveying that a memo came down to them months ago ordering that inmates not be allowed to receive any incoming books or magazines. The handbook claims otherwise.

33. The plaintiff was able to signup to see a visiting mental health Jane Doe. The plaintiff communicated their depression ails, and that they sough intervention; including medication. She stated she'd contact the nurse and ensure the plaintiff receives treatment ASAP, though she could not prescribe any medication. This on 09/13

34. The MH Jane Doe then failed to show up to the facility that Friday, despite being on the schedule.

35. The plaintiff saw the nurse on 09/15 and discussed their need for depression, anxiety, neurological and other outlined interventions. The pre-approved, paid for and mailed in medical products were denied, as the nurse changed her mind, finding the plaintiffs' needs excessive, despite also prior provider and/or nurse's approval. The decision of such was also by SGT. Austin, a jailer

36. The plaintiff sent a one page appeal of the change in approval, and cited multiple authorities. According to the nurse and SGT Austin, the municipality would no longer allow any medical or otherwise items to be sent in or dropped off.

37. DOC 305.14 Inmate Health Care states that "the Sheriff "shall" provide or secure necessary medical and mental health treatments and emergency dental care for inmates in custody" was cited, as was...

38. "Medical care and medications" of the Inmate handbook states that medically necessary hygeine products may be requested and approved in writing by the jail nurse; and...

39. DOC 309.52 Canteen subsection d states that institutions 'shall' permit inmates to purchase approved property not carried in the canteen.

40. DOC 309.20 Personal property was also cited.

41. On 09/16 the plaintiff contacted their attorney, who contacted the nurse. The plaintiff received acne soap, mouthwash, dandruff shampoo, and senna tablets were overnighted (for plaintiffes' GI ails) thereafter.

42. The nurse and SGT Austin pulled the plaintiff into the hallway and informed them that no further physical complaints would be accepted; that no more medications would be ordered for the plaintiff; and that the plaintiff could send a grievance if they wanted, and that they'd be on the lookout for it to deny it; including stating that there was no appeal process, and submiting a grievance would be a waste of everyones time. This on 09/16.

43. Also on 09/16 SGT Austin and the nurse stated that municipality wide, no critically medically necessary care would be provided; and existing prescriptions going forward unrenewed and unprovided unless life critical.

44. On 09/18 The plaintiff sent an BLR for follow up on receiving anti-depressants; and some other outstanding needs.

45. On 09/20 the plaintiff saw the MH Jane Doe, who stated she did not reach out to the nurse yet about the plaintiffs' depression or other conditions; and forgot to bring any workbooks or therapurc material for the plaintiff.

46. The MH worker then again failed to show up that Friday, despite being on the calender. The only days she may be available are Tuesdays and Fridays. The meeting lengths are generally around 5 to 15 minutes, with a longer wait to be escorted out of the room usually.

47. The nurse sent an ELR response stating that no over the counter items will be allowed to be brought into the jail on 09/20.

48. On 09/22 the plaintiff sent a follow up ELR to medical

49. On 09/22 the nurse responded at 10:22AM stating that "the jail physician has denied prescribing further medications"

50. On 09/22 the plaintiffs' attorney called the facility; the plaintiff then received a soap bar and mouthwash; both with a provider Douglas prescription label showing an 09/19 approval date.

51. On 09/22 an ELR response stated that "per jail physician no further medications will be ordered."

52. 09/23 a stool softener was received for the first time; after an apx 6 week delay.

53. On 09/22 SGT Josie Austin stated that the plaintiff would no longer be allowed to see the jail doctor.

54. On 09/24 the plaintiff sent an electronic grievance. Included were inadequate or witheld medical treatments and products; as well as inadequate meals or nutrition.

55. On 09/25 SGT Danielle sat the plaintiff down to go over their grievance. She claimed the plaintiff either misunderstood the past approvals by medical, or was making them up. She went on to convey to the plaintiff that they had no reason to be legitimately depressed. She demanded the plaintiff communicate what coping methods they use, and stated depression medication wasn't needed and to just keep seeing mental health.

56. On 09/25 SGT Danielle stated she would not tell the plaintiff what property items were removed from their cell during a plaintiff cell search that day; unless the plaintiff also agreed to be written up.

57. Requests for copies of grievances were denied by both SGT Danielle, and by SGT Austin, despite that other inmates were given copies as part of the process.

58. 09/28 Staff response that intervention for depression would not be provided unless the plaintiff built up a track record of mental health visits first. The day prior, the plaintiff was not by staff sent to see MH; despite that the plaintiff signed up for it a week, and then a day in advance

59. 09/28 at 6:41 AM SGT Austin pulled the plaintiff into the hallway to tell them that the Sheriff would have a response to their grievance by Friday

60. The discontinued prescriptions by the provider were not discontinued based on individual medical needs; the provider did not meet with the plaintiff prior to their discontinuation.

61. On 09/30 from 12:10 to 12:25 PM the plaintiff met with the MH Jane Doe. She stated that she'd met with the nurse, who then had a discussion with provider Doeglas, together they had come to the determination (without any formal evaluation) that the plaintiff did not require depression, anxiety, ADHD or neurological treatment. They claimed they believe the plaintiff's adverse symptoms to be manifest solely because of the conditions and fact of their incarteration at the facility, and that they could go away on their own if the plaintiff was to get released. They concluded that the plaintiff could continue to see MH if they wanted, and recommended they try to self-motivate themself to be more active.

62. Some of the reported by plaintiff symptoms included: 1.) Feeling extremely sad and empty most of the time; 2.) loss of any pleasure in interests or activities; 3.) pervasive feelings of dread; 4.) a strong urge to sleep or not be conscious anymore, to pass the days away; 5.) feeling mentally and physically slow and impaired; 6.) time seemingly passing extremely slow, each minute as though apx. an hour; 7.) difficulty thinking, reading, or processing information; 8.) Feelings of worthlessness; 9.) an exceptionally heavy perceived body; 10.) getting up or moving seeming to be an intensive chore, both physically as well as mentally.

63. On 10/01 at 6:24 AM an ELR was sent reinforming the staff that the slamming of doors at night is negatively impacting the possibility of sleep

64. on 10/02 staff (still) refused to print any of the plaintiffs' grievances; the plaintiff rewrote much of such back out in the form of a petition. A summary of segments follows: 1.) 7 CFR 226.20 Requirements for Meals; published by the Department of Agriculture states that liquid milk must be served. Meals have a minimum fruit requirement. Whole grain rich servings must be provided; 2.) DOC 309.23 Food section 1 states that the department shall provide nutritious and quality food for all inmates; and that the weekly meals shall be posted for the following week; DOC 350.11 Food service states that jails shall provide nutritious and quality food for all inmates; that variations may be allowed provided nutritional goals are met; and section 7 states that food temperatures must be properly maintained; 3.) 21 CFR 107.78 Health claims: Fruit and vegetables and Cancer outlines the medical importance of a diet high in fruit and vegetable intake; 4.) 21 CFR 107.72 Health claims: Calcium, vitamin D, and osteoparosis outlines the medical importance of adequate calcium and vitamin D intake; 5.) Pierce County inmates are not being provided nutritionally adequate meals. P.C.J does not provide or allow for purchase milk, yogurt/probiotics, or the serving of fruit; 6.) cake and chips are a junk food, yet they account for up to 2/3 of a meal; 7.) food temperatures are not commonly adequately maintained; 8.) blanket ban policies on medical care is an unlawful practice.

65. Numerous inmates signed the petition, added individual impact statements; and staff refused to make copies.

66. Fish or fish oil is also not provided.

66. Another inmate requested copies, which staff then provided

67. On 10/02 at 643AM the plaintiff sent an ELR requesting dose increases for sleep aids,

68. The provider and nurse had agreed to such during numerous past interactions. The starting dose was lower than the plaintiff received on the outside, due to such a long period having gone without; and they agreed that tapering it gradually up to such point, or increasing it beyond the outside dosage if needed, would not be a problem

69. On 10/04 the nurse responded to the ELR stating that "this has been denied by the physician"

70. On 10/04 the plaintiff was not brought to mental health, despite having numerously signed up days to week in advance; though others were allowed to see her.

71. On 10/04 SGT Turner responed electronically to a grievance stating that the jail was in compliance with all raised matters, and no action would be taken.

72. On 10/04 6:32 PM a message to medical received a response to such had been forwarded to the nurse. PCJ medical requests first go to jailers, who can review and triage such, despite lack of medical training.

73. On 10/04 the plaintiff re informed medical that the provider and (only nurse) had previously approved to increasing sleep medication doses for adequate care.

74. On 10/05 12:06 PM the nurse ELR responded that "the jail physician has denied this request."

75. The plaintiff was not reexamined pertaining to the denial.

76. On 10/05 Lt. Ali Verges responded to a grievance, declining to further investigate.

77. On 10/12 during nighttime medcart, the plaintiff inquired about seen fiber powder on the cart. The deputy who read the label stated it was an as needed once in the morning and again at night for the plaintiff.

78. The nurse had not informed the plaintiff, nor had she added a PRN approval

79. On 10/13 the plaintiff received the first provision of fiber, after apx two months of pain and damages.

80. On 10/20 the plaintiff notified staff that the wire from one of their braces was inside the plaintiffs' cheek, mutilating it and causing bleeding and persisting pain. It was deemed a non-emergency by staff.

81. The braces had active local appointments missed as staff refused to provide transport, even though the care would have cost them nothing. The braces gradually became further misaligned, causing mouth sores and pain. The issue had been raised during numerous in person encounters with the nurse, though any treatment denied, as it was claimed the harms were voluntary, they only provide emergency tooth extractions, and that the most she would allow is for the plaintiff to have the braces removed.

82. On 10/25 the plaintiff provided MH a letter, which she photocopied for her own records, and to provide the nurse and jail doctor with a copy. A summary of segments is to follow.

83. 1.) The plaintiff finds it increasingly difficult to hold coherant thoughts," 2.) the plaintiff felt they needed to be admitted to a mental health facility to receive full time care; 3.) the plaintiff was becoming unhinged; 4.) the plaintiffs' pervasive dread is so overwhelming that their body is negatively responding 5.) the plaintiff desperately does not want to exist any longer, with the headspace they've had to endure; 6.) the plaintiff had active suicidal ideations and had for sometime; 7.) the plaintiff desperately wishes to make ammends with and speak to or see loved ones, and the inability to results in life seeming pointless to go on with; 8.) that the plaintiff feels such sadness and emptiness that it baffles them that they are still capable of sustaining life; 9.) the plaintiff needs professional help, and they need it now; 10.) the plaintiff feels as though on the verge of a full mental breakdown; 11.) a drastic change and accomodations are needed; 12.) the lack of essential nutrients is likely not contributing to healthy neurological conditions and functioning; 13.) the plaintiff has effectively not slept in over a week, was hallucinating, hearing voices, seeing people or objects out of the corner of their eye that aren't really there (and startling the plaintiff); 13.) the plaintiff developed full time tremors; 14.) the plaintiff frequently has a racing heart and is dripping with sweat; 15.) muscles spasm or contract at random; 16.) going on suicide watch would only worsen the plaintiffs' state; 17.) the plaintiff can't remember the names of family, or recent or brought up events, unless written and available.

18.) each breath feels a waste, the thought leading to hyperventilating; 19.) the plaintiff has no self worth or self esteem remaining; 20.) the plaintiff feels they are far past the point of pulling themselves out of the state, and require someone else to take over; 21.) the plaintiff sought anti-depressants, daily talk therapy, a non-hostile environment, cognitively challenging activities, sleep intervention, a stimulating environment.

84. since the plaintiffs' grievance, night staff seemingly began using a unit to unit side door right outside the plaintiffs' cell with far more frequency; and with slamming of the door. They used to use the main cell block doors, or gently close the side door.

85. The plaintiff was essentially in segregation while in G block. Others played nice when staff were present, but were malicious often elsewise. The plaintiff tended to remain laying on the bunk in the cell.

86. on 10/05 around 6:45PM SGT Dustin entered programs room south stating someone had talked in the hallway, so everyone was receiving a written warning in their file; plaintiff was further disvaded from accompanging others to the programs room.

87. on 10/11 from 10 to 1015 AM the plaintiff saw MH, who stated that the plaintiff need not come any more unless they had case updates (what she usually prodded to talk about) to share with her or specific things to talk about; and that she would not be coming that Friday.

88. On the 10/11 MH interaction, the plaintiff responded that they were doing very poorly and felt to be rapidly mentally spiraling down. She responded along the lines of that being in jail is tough on everyone, and it is what it is.

89. On 11/01 from 2 to 2:10 PM the plaintiff was in the nurse office, LT. Ali Verges stood in without the plaintiffs consent. She spoke once the nurse was finished, stating who she was, that the Sheriffs' office had received the petition from an outside source and she now had to investigate it's claims; despite that she felt she had already addressed and closed the matter with the plaintiff. She stated she would not review the plaintiffs complaint unless she received typed copies (there are no type-writers in PCJ; sending an ELR of multi-page text would take hours if possible; each cell block has only one kiosk and the plaintiff would surely come to adverse inmate harm trying to monopolize it that long; and such would be impossible as the kiosks repeatedly will randomly boot people off, causing them to lose any progress typed in shorter messages); she stated that the physician, nurse and MH provider will not provide further insomnia treatment, and that anxiety, neurology and depression treatment would not be provided unless the plaintiff went to programming far more often, and MH every time its offered, and developed a long track record of them being ineffective. The nurse would be putting the plaintiff on Centrum silver 55+ with lutein for their worsening eye floaters (vision obstructing). That the plaintiff would be having

their braces soon removed. The nurse affirmed a medical need for acne wash, as going without, in her words, could result in infections, scarring and the potential need for antibiotics. Prescription lotion would be provided for the cracking dry skin that canteen lotions were inadequate for.

90. On 11/02 the plaintiff again asked to be rehoused in minimum or segregation, to escape cell block conditions.

91. On 11/03 around 4pm Lt. All Verges closed the petition matter, claiming staff were in full compliance on all matters.

92. On 11/03 around 4/430 PM deputy D Matthews stated near the (recordable) cell block intercom that he and the other jailers are "not medical professionals" despite their gatekeeping and ability to review all medical requests.

93. On 11/04 MH was seen, who stated she'd speak to LT. All Verges about being moved to minimum security.

94. Around noon on 11/04 a contractor poured a chemical into the shower drains, the result was a reeking smell akin to raw sewage or caustic acid and burnt hair, causing burning eyes, gagging, retching and distress. The plaintiff intercommed deputies asking to have the cell door left open (as it sometimes elsewise is) or to change units temporarily (as we're made to do during a shakedown or insect treatment); both were denied, despite harmful reactions having been conveyed. The plaintiff ran water down the drains, and eventually had to leave the cell block and join the other inmates in a program room.

95. on 11/08 the plaintiff saw MH, seeking a housing block move, and medical interventions; including again sharing that current treatments were as is ineffective. The plaintiff stated they believed numerous conditions to be based on neurochemical imbalances, and past the point of self resolution. The provider responded that the plaintiff needed to put in more effort; to do what they can to make their own progress and get better. The plaintiff again raised that such was seemingly outside their control. And that inmates had been telling the plaintiff that the only way they'll get help there is to open their wrists or "take the leap" for the team" from the unit balcony; or to kill themself so others can get treatment; to man up and get it over with on their own before someone takes their life for them.

96. The plaintiff was around this time moved to minimum security housing; citing the reason on the reclassification sheet as "positive attitude, and staff compliance."

97. on 11/12, night med cart, the plaintiff received their first dose of Doxepin. The plaintiff was prescribed this and an anti-depressant sometime before this date.

98. The plaintiff at this time had just started a new medication; they were not stabilized psychologically; they had recently been moved to a new environment; the plaintiff was in ongoing and known of crisis.

99. on 11/18 just prior to 7PM medcart (and the second dose of the new medications), the plaintiff was processed out of PCJ.

100. The plaintiff arived at Saint croix county jail around 750PM.

101. The plaintiff was body scan machine searched

102. The plaintiff was told by the Jane Doe SGT who booked the plaintiff that they were on a detain status, held for Pierce County, but had no indication of why they were sent there.

103. The plaintiff was made to fully strip, spread and squat and cough by ofc. Bradick (unsure on spelling) and another. while squating and spreading, Bradick stated "thats gross dude., stop that" despite that such had been commanded by him.

104. Intake had been informed of the plaintiffs outstanding medical needs. The SGT Jane Doe stated a dose of clonidine could be provided, but all other prescriptions were invalid unless represcribed by their staff. She stated that the county did not allow chronic care for inmates, including sleep, ADHD, anxiety or Insommia.

105. Due to the plaintiffs victimizations in custody, and medical concerns, the plaintiff was housed in J block, cell 2, which was a medical pod with only one other cell.

106. The cell was filthy; with large quantities of hair and skin, blood and feces within. The plaintiff was up until 11 PM using an already dirty mop to try to clean the space

107. The cell (and all subsequent) had 24 hour lighting, which significantly negatively impacted the possibility of adequate or restful sleep

108. On 11/19 from 1240 to 140PM the plaintiff saw nurse Ginnie; largely going over the health questionare.

109. She denied the anti-fungal prescription the plaintiff still needed; the benzol peroxide wash for acne; prescription lotion; prescribed eye drops (for painful dryness and vision obstructing eye floaters); prescribed multi-vitamin w/ lutein (claiming the plaintiff could have it if they had labs done showing they needed it; and that she'd change the plaintiff "hundreds of dollars" for each involved test). She denied all pain relievers, including Naproxen (the only one that could help); she stated the county did not allow chronic care, so a second mattress, bottom bunk pass, physical therapy, or any sort of accomodations were denied; the plaintiff asked if they could be accomodated to at least go to rec more than once or twice a week, to which she responded that if the plaintiff wanted to "keep pushing this disabled thing, I can actually order that you not be allowed any activity." She stated that the county does not recognize or treat insomnia, neurological issues, ADHD, anxiety; and that she'd be discontinuing all of the plaintiffs prescriptions save their antidepressant. She claimed she'd not allow the plaintiff their eyemask, or to receive earplugs, as "no one else needs them." As to the active mouth sores and injuries, she said to brush 4 times or more per

day if the plaintiff felt like it, but that she would
not be allowing the mouthwash, salt rinses or
pain relief. She provided a 75mg dose of the plaintiff's
antidepressant, and stated they won't even look into an
increase until after 30 or more days of documented
ineffectiveness. (Dr. Douglas had stated he'd up it in two weeks)

109. The nurse provided sheets and ordered the plaintiff
log wake up and sleep times, programs, exercises, specific
thoughts, feelings, moods, what made it better, worse,
bowel movements and urine passes each day, and for
the next two weeks.

110. She stated that if the plaintiff skips anything and
doesn't fill it out in full, that she'd have mental health
services delayed, or they could be witheld, and that
seeing the doctor would not be allowed.

111. The plaintiff's fiber was denied. For each denial, the
plaintiff pointed out why each was prescribed and needed.
She stated that the plaintiff better think twice about
going down that road with her.

112. The nurse stated that they don't have the staffing
for mental health to hold peoples hand for each little
woe, and that there's no way the plaintiff will be seen
daily; at best, she stated every 3 weeks was realistic

113. The nurse was informed of the plaintiff's past
victimizations, vulnerability to harm from segregation,
outstanding medical needs and likely harms,

114. The nurse claimed the plaintiff would be fine, and
that she was sure they'd live.

115. The nurse conveyed that "those days are over where you'd be seen for every little concern of yours," and that "nobody has that many legitimate medical concerns."

116. On 11/19 at 420 PM during Med Cart pass, the plaintiff asked nurse Ginnie if the medical doctor had come to a determination to approve any of the medications. She stated that the provider agreed with her and denied all other prescriptions.

117. The plaintiff recommunicated that the insomnia was extreme, and that the plaintiff required medication.

118. Officer Bradick, who was escorting the nurse, butted into the medical conversation, stating that if the plaintiff wanted to go down a road of ultamatums, that he had a special cell just for them in booking (a suicide watch cell).

119. The plaintiff stated that such a cell would be devestating to them, and would do nothing to help with the reported inability to adequately sleep.

120. The plaintiff stated that it had taken months of serious harms and paperwork to finally get the treatment they needed while at PCJ; that if they were unwilling to provide the care the plaintiff needed, then the plaintiff needed to be sent back to PCJ.

121. The nurse stated "you're not going down down that road here" or a variation; and told the plaintiff to packup, she was putting them in a suicide watch cell in booking

122. The plaintiff was put into a suicide watch cell surrounded with windows.

123. The officer went through the plaintiffs' property and threw away legal papers, canteen, and heavily intervened with property that had already cleared the search during booking.

124. The plaintiff pleaded with the nurse through the door not to be in such a cell, and the harms it'd cause. The plaintiff asked how long they'd be there? and was told that "it can take months, sometimes years to adjust to being without medication" and "get over insomnia". The plaintiff agreed that they'd go without any medication. The nurse responded that the plaintiff had already "pushed" to "set this bus in motion" but if the plaintiff reported to her that they slept, she'd look into having them released. The plaintiff asked to immediately see mental health. The nurse stated MH wouldn't be in for a few days; and that she was sure the plaintiff would be fine given the cell they're in.

125. The observation cell was directly in front of booking/intake, and had in cell cameras. The plaintiff had no privacy from other inmates, jailers or contractors. The cell was filthy, with blood and feces, food and mildew throughout, including heavily on the ceiling.

126. Books and religious services and text were asked for from seperately the officer and the nurse.

127. An uninvolved staff member later brought numerous of the exact Harry Potter book the plaintiff had already read.

128. It was stated those in segregation do not receive religious services or accomodations.

129. The plaintiffs' in cell bed was upon a concrete slab in the center of the room. The plaintiff was subjected at near all hours to severly deranged, hostile or loud conducts by near or passing prisoners, as well as bookings, drunks; staff music, conversations and horseplay. There was 24 hour lighting, including the bright booking area lighting. There were pervasive gut wretching smells, inmate berations, and the plaintiff turned to something akin to a zoo exhibition. There further was no privacy divider of any sort for the toilet; subjecting the plaintiff (a pretrial detainee) to immense exposure and humiliation. Staff would often ignore verbal prompts, waves or attempts at interaction by walking indifferently past, merely leer, or laugh and make no effort to establish communication or follow through.

130. The plaintiff was not gradually tapered off medications. They were without viable coping methods, had no viable books to read, and suffered greatly. The plaintiff was intentionally subjected to sleeplessness, pain, extreme anxiety, immense risk of suicidal ideation, and without support or resources needed. The officer had taken the plaintiffs' eyemask, stating that the county did not allow eye coverings.

131. The plaintiff did not sleep, though repeatedly tried meditating to keep the rising senses of terror, overwhelming anxiety and severe depression at bay. The plaintiff, though reported upon seeing the nurse the next day that a few broken hours of sleep were possibly had; and again asked to leave observation, reexplaining the harms.

132. The nurse responded that she found it "highly concerning" that the plaintiff claimed they "apparently had all this trouble sleeping yet slept just fine when challenged," and that it raises serious doubts about anything else the plaintiff claims they struggle with.

133. The nurse stated that she isn't going to waste her providers' time with non-life endangering medical concerns.

134. Upon rerequest for books or religious services, she stated that the plaintiff would "get nothing" while in observation.

135. When again asked if the plaintiff could leave segregation, she stated it was in MH's hands now.

136. During the following days, the plaintiff made numerous requests to see Mental health; to every new and unbusy officer each day that the plaintiff could get to talk to them.

137. No medical staff actively observed the plaintiff while in observation. And even if they had, no physicians were involved and present; and even if there were, none were sleep specialists. No legitimate sleep study was being conducted. The conditions were directly atypical, harsh and inconducive to outright harmful to that claimed being

observed", as well as to communicated and outlined
disabilities; resulting in extreme exastrobations of such,
serious psychological pains, protracted acute discomforts,
and were near to the plaintiff torturous. ____  ___ __

138. No showers were provided. No lumbar supported
seating. No desk.

139. A Jane Doe with mental health eventually had the
plaintiff sent to a room to speak to her. The provider acted
cold to hostile. She stated that she'd been told that the
plaintiff likes to make up medical concerns, she asked
what was so hard in the plaintiffs' life that they
claimed to have all these mental health issues.
The plaintiff brought up the chronic and debilitating
and undeliberate natures of most; the still immense
love for people the plaintiff was unable to talk to; abuses
suffered in custody; their fear for their life, and past
traumas. The MH Jane Doe conveyed that she thought
the plaintiff to have hurt more people than they loved.
She went on to decline to intervene with unprovided
medications; and stated that she doesn't have the time
to sit and listen to someone like the plaintiff; that she
had people with real debilitations to invest her time in. She
stated she would set a follow up in a month or two; that SCC
does not have the resources or staffing to waste on short
term prisoners; and that SCC does not allow treatments
for chronic or psychological disorders. She affirmed that
she'd have the plaintiff removed from segregation.

140. She later falsely claimed via ELR that the plaintiff was
in segregation as long as they were for refusing to see her.

141. The plaintiff sent a response that they had begged and pleaded everyday to see her. She responded to such that she had nothing more to say on the matter.

142. The cell the plaintiff was in once in general population had no closable door. Any staff member or inmate could see the plaintiff in states of undress or using the toilet. and...

143. The cell window was poorly seated, insulated or caulked. The bunk space was freezing cold; leaving a cup of water at the window at night would freeze it. The plaintiff shivered and the cold inhibited sleep access.

144. The cell block was loud, even at night; and jailers would speak to oneanother or inmates at night at daytime volume; such inhibited access to sleep.

145. Inmates in the block made numerous highly sexually charged remarks to the plaintiff, openly talked about graphic rapes and resulted in a perpetually negative atmosphere to be in; resulting in exastrobations in the plaintiffs' psychological conditions. The plaintiff largely remained in the cell.

145. The toilets would not allow more than about 2 or 3 flushes per half hour or it'd lock it out for up to an hour; resulting in perpetual smells of human waste; and the plaintiffs' cellee having unflushed feces or living with a clogged toilet.

146. No relevant religious services or texts were available

147. No books were allowed sent in

148. No outdoor rec was available; indoor rec had minimal accommodations, irrelevant to plaintiffs' needs (free weights, medicine balls, no treadmills, bikes, roman chairs, 45° low back)

149. The plaintiff sent and escalated grievances, and sent Medical more ELR's

150. The facility would not provide copies of material, such as grievances; and the plaintiff does not have reliable sources for such. Such will have to be obtained during discovery; though the topics of issue in the grievances related to elements described.

151. On 12/01 from 6:45 to 7:10PM the plaintiff met with the nurse at the medical room.

152. The nurse stated that in addition to their weekend doctor, the primary doctor and their supervisor reviewed the plaintiffs' alleged medical needs, unprovided prescriptions and complaints; and agreed with the nurse that the plaintiffs' medical needs were excessive, and to uphold the denials. Further, as CCJ does not recognize chronic medical needs, all were deemed to be not medically necessary.

153. The nurse stated that the plaintiff "appeared fine" was "breathing and eating" as far she could see, and that if they could maintain doing those things, they had it better than others and would be fine. She stated that the plaintiff didnot need unbroken sleep as nothing they could do "mattered anymore;" the jail wasn't required to have alert and active inmates; that sleep for health didn't apply once locked up.

154. The nurse claimed the SCCJ meals were nutritionally sound. Though when pushed on cake being given with every meal, lackings of adequate fruit or other sides, there being no fish? and when asked if she knew what was in the drink mix packets, and if they perhaps had the missing vitamins in them, she stated she "don't know where the inmates get their nutrition from."

155. The nurse denied renewing the stool softener, and would not provide the fiber. Her reason was that "most people don't need that" and threatened that if the plaintiff really wanted to file paperwork on her and push the issue, she'd have them put back into "medical segregation" so they could "observe" the plaintiffes' bowel movements until they get better."

156. She stated that the plaintiff having walked to her office was proof it wasn't that bad, next issue..." this in regard to the plaintiffes spinal pain and condition.

157. In regards to the freezing cell, she stated that she sure does have the power to give the plaintiff another blanket, but "at this point won't," that the temperature is set to what the DOC says it has to be, and "that's that," "next issue."

158. The plaintiffes' attorney had repeatedly been contacting medical, and being ignored.

159. The nurse stated that she wasn't "available" to speak to the plaintifes' attorney "for at least 3 weeks" and doesn't know when the doctor will be there next, and won't talk about things she already denied anyways.

160. The segregation cells did not have outdoor light or windows. General population had a frosted cell window that one could not look out, both causing perceived alienation and difficulty seeing beyond the confines and conditions.

161. No relevant programming was available to attend, such as education based or recidivism reducing.

162. On 12/03 from 740 to 1030 AM the plaintiff was picked back up by PCJ staff Knutson; the plaintiff was returned to minimum security; prescriptions were on a review hold.

163. On 12/04 the plaintiff received the anti-depressant; AM else on a review hold

164. On 12/05 the plaintiff requested pain relievers; at 1022 AM staff stated the nurse had discontinued all pain relievers, including as needed pay per doses.

165. On 12/06 the plaintiff was escorted to medical by SGT Austin, who stood in from 240 to 257 PM. The nurse stated that as of December 1st, all over the counter products and treatments were being taken back and discontinued. That pain, sleep or other disorders will no longer receive treatment; as the county no longer recognizes them as medically necessary, and provider Douglas agrees. She stated that no future medical care will be provided to the plaintiff unless it is "emergency medical services" as everything else is now considered "creature comforts, similar to asking the front desk at a hotel for," and that medical treatments would not be provided unless there is an "imminant threat to health or life" to avoid "favoritism."

166. Pain medication was said to be a "luxery"

167. SGT Austin kept telling the plaintiff to "get up and leave" because she had better "things to do", despite that the plaintiff was still actively speaking to the nurse.

168. The nurse stated she had not been reading the plaintiffs' recent messages to her, and to notify staff if they have a life urgent emergency.

169. On 12/06 around 11AM the plaintiff saw MH

170. On 12/09 the plaintiff was not brought to MH, despite putting in for it days in advance, and notifying her on 12/06 that they were not doing well.

171. 12/20 the plaintiff was not brought to see MH, despite putting in for it days in advance.

172. MH did not show up that Friday

173. MH did not show up either day the next week.

174. 12/22 10:22AM an ELR from the nurse stated that the provider increased the anti-depressant dose, and made the fiber twice per day, without seeing the plaintiff.

175. 12/27 A long message was sent to the nurse on medical needs outstanding.

176. 12/28 1:04 PM a response of "noted" and along the lines of no change.

177. To note, knutson with Pierce County transported the plaintiff from SCCJ, to have their braces removed, then brought back to SCCJ.

178. Upon returning on this date unknown, the plaintiff was subjected to both the body scanning machine, and to a strip search.

179. The segregation cells at PCJ, and the G block cells, were built with clear panel glass, rather than iron bars or solid wall exposed to the outside common area.

180. Along the area opposite the cell facings was two stories of one way mirror glass. Jailers could see in but inmates inside saw a reflection of that within.

181. The design resulted in inmates using the toilet to be totally visible to every inmate, even those seated in the common area, same if in a state of undress. The showers could also be seen into, as could they be seen into by anyone walking up the steps to the upper tier. There were cameras high mounted and facing the showers, and cameras in each cell.

182. The design result was an environment of inmate to inmate sexual harassment, exhibitionism, humiliation, degredation and high anxiety to panic or duress.

183. SCCJ general population had a similar one way glass wall, allowing and resulting in similar outcomes

184. PCJ had no windows one could horizontally look out or find grounding to a world outside the walls with. Each block had a ceiling mounted window in their common area, which would be covered with snow in the winter months.

185. An inmate named Jordan McCray had a second mattress at PCJ, when brought up to the nurse, she's exclaimed that she wouldn't talk to the plaintiff about what other inmates may or may not receive. Despite the plaintiff numerously told that PCJ has no such accomodation.

186. During the initial medical appointment with the PCJ nurse, the plaintiff had remarked on the cold meals that entailed 2/3 cake and potato chips, and the 1/3 remaining usually a slimy slice of bologna, as well as white bread. The nurse responded by laughing hysterically and stating " I could not survive eating What they serve you all here." She did not know what was in the drink mix packets.

187. PCJ had only the one nurse. No doctor visited the site regularly or generally. Once the nurse went home in the afternoon on the weekdays she worked (not always consistently there) there were no medical staff on site; same all day and night on the weekends.

188. Both PCJ and SCCJ would run out of medications, and those prescribed left without until restocked.

189. Contrary to sound correctional practices and the weight of multi-century documented psychological and physiological opinion, SCC and PC fail to prevent the improper use of segregation or unaccomodated general housing units to store mentally ill prisoners. Unaccomodated or deprivation heavy conditions can cause enormous harms in even previously healthy individuals. Risks and practices may in part include: 1.) a lack of adequate exercise; 2.) a lack of educational programming; 3.) a lack of religious programming; 4.) constant cell illumination; 5.) excessive and disruptive noise; 6.) limited access to property; 7.) limited access to the outdoors, including physically and visually; a failure to enhance mental health program resources and exposure; 8.) sensory deprivation; 9.) stimuli

deprivation; 10.) sleep deprivation; 11.) inadequate staff training relating to prisoner mental health, and alternative modes of interacting with such special population.

190. SGT Josie Austin had the oversight of PCJ programs

191. Signers of the petition include: 1.) the plaintiff; 2.) John Robinson Jr; 3.) Franklin Masterson; 4.) Jett Treasue; 5.) Jordan McCray; 6.) Ronald Wild; 7.) Charles Hoierod; 8.) John Moeller; 9.) David A. Thomas Jr; 10.) Mr Murphy; with contact information as well as brief individual impact statements. All agreed to take part in any future legal actions.

192. The plaintiff was released from Pierce county on 01/23/2023

193. The plaintiff lacks additional records written in custody from last entries on; and discovery will add further facts.

194. Both PC and SCC jail lacked hot water availability; sometimes warmish water was available if water was retrieved from a shower tap.

•Mammana v. Fed. BOP, 934 F.3d (3rd Dist. 2019)
"[S]leep is critical to human existance, and conditions
that prevent sleep have been held to violate the
Eighth Amendment." Additionally, bright, constant
illumination that causes "grave sleeping problems"
Can establish an Eighth Amendment deprivation.

   ° Walton v. Dawson, 752 F.3d 1169, 1120 (8th Cir. 2014)
Noting "the Constitution guarentees a minimum right to sleep."

   • Reck v. Pate, 367 U.S. 433, 81 S. Ct. 1541 (1961)
Recognizing deprivation of food and sleep as unconstitutional punishment

   • Toussaint v. McCarthy, 801 F.2d 1080, 1110 (9th Cir. 1986);
accord, Antonelli v. Sheahan, 81 F.3d 1422, 1433 (7th Cir. 1996)
Holding allegations that excessive noise "occured every night
often all night, interrupting or preventing [plaintiffs'] sleep,"
Stated a Constitutional claim

   • Ashcraft v. Tennessee, 322 U.S. 143, 150 n.6, 64
S. Ct. 921 (1944) "It has been known since 1500 at least
that deprivation of sleep is the most effective torture
and certain to produce any confession desired"
quoting Report of Committee on Lawless Enforcement
of Law, Section of Criminal Law and Criminology of
the American Bar Association, 1 American Journal of
Police Science 575, 579-80 (1930)

• Coleman v. Wilson, 912 F. Supp 1282, 1298 & n.10, 1305-06 (E.D. Cal 1995)   Adequate prison mental health care requires "a systematic program for screening and evaluating inmates to identify those in need of mental health care;" a system that provided care only to those who self-report, who have medical records indicating prior psychiatric history, who exhibit bizarre behavior, or who ask to be seen by a psychiatrist is constitutionally inadequate, since some seriously mentally ill inmates are incapable of making their needs for care known.

• Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 560-61 (1st Cir. 1988)   Transferring a mentally ill inmate to general population in a crowded jail with no psychiatric facilities constitutes deliberate indifference

• Ginest v. Board of County Commissioners of Carbon County, 333 F. Supp. 2d 1190, 1201 (D. Wyo. 2004)   "all patients on psychotropic medical must be monitored in a periodic basis to determine (1) if the drug is causing any harmful side-effects, and (2) if the drug is working the way the doctor intends for it to work"; "Prison officials have a constitutional duty to adequately monitor inmates prescribed psychotropic medication, whether they request such monitoring or not."

° Occoquan v. Barry, 717 F. Supp 854, 868 (D.D.C. 1989) Inmates with mental health problems must be placed in a seperate area or a hospital and not in administrative/punitive segregation area

° Langly v. Coughlin, 709 F Supp 482, 484-85 (SDNY) Placement of mentally ill in punitive segregation results in conditions that may violate the Eighth Amendment

° Coleman v. Wilson, 912 F. Supp 1282, 1320-22 (E.D. Cal 1995); Arnold on behalf of H.B. v. Lewis, 803 F. Supp. at 256. The Eighth Amendment is violated by the placement in segregation of "the already mentally ill, as well as persons with borderline personality disordered, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe."

° Carnell v. Grimm, 872 F.Supp. 746, 756 (D. Haw 1994) Holding that "an officer who has reason to believe someone has been [sexually assaulted] and then fails to seek medical and psychological treatment after taking [them] into custody manifests deliberate indifference.

Knop v. Johnson, 667 F. Supp. 512, 524-25 (W.D. Mich. 1987) Evidence that the prison system spends a lot of money and hires a lot of staff does not refute a deliberate indifference claim about the medical care system. Aff'd in part and rev'd in part on other grounds, 977 F. 2d 996 (6th Cir 1992)

Lavender v. Lampert, 242 F Supp. 2d 821, 843 (D. Or. 2002) The failure of medical staff to respond to ongoing complaints of chronic and debilitating conditions could constitute deliberate indifference even though the prisoner regularly received medical services

Comstock v. McCrary, 273 F.3d 693, 707 n.5 (6th Cir 2001) "Defendants' position is, apparently, that if a prison doctor offers some treatment, no matter how insignificant, he cannot be found deliberately indifferent. This is not the law...."

Hall v. Artuz, 954 F. Supp. 90, 94 (SD.N.Y. 1997) "The fact that [plaintiff] had many medical consultations... does not establish that he was not denied medically necessary [care]"

Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir 1980); accord, Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir 1991); De Gidio v. Pung, 920 F. 2d 525, 533 (8th Cir 1990) "Consistent pattern of reckless or negligent conduct" establishes deliberate indifference.

Sulton v. Wright, 265 F. Supp. 2d 292, 300 (SDNY 2003) "Even if an inmate receives 'extensive' medical care, a claim is stated if... the gravamen of his problems is not addressed."

Krug v. Lutz, 329 F.3d 692, 697 (9th Cir 2003)
Holding due process for rejection of correspondence extends
to receipt of publications; appeal to someone other
than the censor is a due process requirement

Prison Legal News v. Lehman, 397 F.3d 692,
699-700 (9th Cir 2005) Ban on non-subscription bulk
mail and catalogs struck down as having no rational
relationship to controlling contraband, since contraband
is more likely to be contained in first class mail, and
no rational relationship to limiting property and fire
hazards, since there was already a rule limiting the
amount of property

Kincaid v. Rusk, 670 F.2d 737, 743-45
(7th Cir 1982) Ban on pictorial magazines, newspapers,
and hardcover books, designed to prevent fires and
protect plumbing, violated the first Amendment

Thornburgh v. Abbott, 490 U.S. 401, 407-08,
109 S. Ct. 1874 (1989); King v. FBOP, 415 F.3d 634,
638 (7th Cir 2005) "Freedom of speech is not merely
freedom to speak; it is often freedom to read...
Forbid a person to read and you shut him out of the
Marketplace of ideas and opinions that is the purpose
of the free-speech clause to protect."

1. Glaspy v. Malicoat, 134 F. Supp. 2d 890, 894-95 (W.D. Mich. 2001) "There are few activities that appear to be more at the heart of the liberty guarenteed by the Due Process clause of the Fourteenth Amendment than the right to eliminate harmful wastes from ones body a way from the observations of others."

2. Colewell v. Bannister, 763 F.3d 1060, 1068 (9th Cir. 2014) "Blanket Categorical denials of medically indicated [needs] soley on the basis of an administrative policy... is the paradigm of deliberate indifference."

3. Heard v. Sheahan, 253 F.3d 316, 318-19 (7th Cir. 2001) Jail officials were aware of prisoner's need for medical treatment and refused to do anything about it "[t]his refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail," and [e]very day that they prolonged his agony by not treating his painful condition marked fresh infliction of punishment."

4. Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005). Absence of "objective" evidence of pain and suffering does not excuse refusal to treat it, since "self-reporting is often the only indicator a doctor has of a patients' condition."

5. Hamilton v. Endell, 981 F.2d 1063, 1066-67 (9th Cir. 1992) Transferring a prisoner in need of urgent medical attention to a facility that the official knows is unable to provide the treatment is conduct that would alert a reasonable person to the likelihood of personal liability."